# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

**JOSIE TAM,**

      **Plaintiff,**                                **No. 2:08-cv-2812-BBD-cgc**

**v.**

**HARRAH'S TUNICA CORPORATION, INC.,**
**HARRAH'S ENTERTAINMENT, INC.,**
**GRAND CASINOS, INC.,**
**HARRAH'S OPERATING COMPANY, INC.,**
**and BL DEVELOPMENT CORPORATION,**

      **Defendants.**

---

**GEORGIA WILLIAMS,**

      **Plaintiff,**                                **No. 2:08-cv-2813-BBD-cgc**

**v.**

**HARRAH'S TUNICA CORPORATION, INC.,**
**HARRAH'S ENTERTAINMENT, INC.,**
**GRAND CASINOS, INC.,**
**HARRAH'S OPERATING COMPANY, INC.,**
**and BL DEVELOPMENT CORPORATION,**

      **Defendants.**

---

# MEMORANDUM OPINION AND ORDER

On July 25-26, 2011, the Court held a non-jury trial in the above-captioned matter. Plaintiffs Josie Tam ("Tam") and Georgia Williams ("Williams") each brought claims of age discrimination against Defendants Harrah's Entertainment, Inc. and Harrah's Operating Company (collectively, "Harrah's") pursuant to the Age Discrimination in Employment Act, 29

U.S.C. §§ 621 et seq. ("ADEA"). Tam also alleges unlawful discrimination on the basis of national origin and retaliation for engaging in a protected activity, both in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq. ("Title VII").[1] Upon consideration of the testimony and credibility of the trial witnesses, and upon careful examination of the exhibits, applicable law, and the post-trial submissions of the parties, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Facts Common to the Claims of Both Plaintiffs

This case involves alleged discrimination directed against several workers at a casino in Tunica County, Mississippi. In 1996, Grand Casinos, Inc. ("GCI") opened and began operating the casino under the moniker Grand Casino Tunica ("The Grand"). GCI hired both Plaintiffs when it first opened The Grand. In June 2005, Harrah's purchased The Grand and took over operation of the casino. Thereafter, GCI ceased to be involved in the management of The Grand and had no further contact with Plaintiffs.[2] Many employees of The Grand remained employed at the property in their same positions, but as of 2005 they were employees of Harrah's, not GCI.

Harrah's is a well-established company in the gaming industry that strives to operate casinos of the highest quality. It emphasizes customer service and utilizes a team-oriented approach to meet its customers' needs. In particular, Harrah's prides itself on its exceptionally well-trained staff. It maintains a variety of measures to ensure that performance expectations are communicated clearly and employees are equipped with the knowledge and skills necessary to meet those expectations.

---

[1] The Complaints also allege discrimination on the basis of gender and race in violation of Title VII, but Plaintiffs voluntarily dismissed these claims at trial.

[2] Initially named as a Defendant, GCI was later dismissed from this action.

After acquiring The Grand in 2005, Harrah's began evaluating the culture and climate of the property, a process which included an appraisal of the competence and capabilities of existing staff-members. To this end, Harrah's administered a "pulse survey," which revealed to the new management that employee engagement at The Grand was low, communication amongst employees was poor, and that the leadership team on the whole was not well-respected by subordinate employees. These results led Harrah's to implement numerous measures aimed at increasing employee engagement, improving customer service, and stabilizing turnover. In time, Harrah's introduced a variety of other surveys to identify areas that required improvement to bring employee performance up to Harrah's expectations. Harrah's eventually phased out the employee appraisals that GCI had utilized and introduced its own evaluation system. Like all Harrah's employees, Williams and Tam each were evaluated pursuant to Harrah's performance standards beginning in early 2006. For reasons set forth fully below, Harrah's judged Williams and Tam to be deficient in a number of performance areas in the evaluation period preceding their termination. These deficiencies prompted Harrah's to place both Williams and Tam on individualized plans to improve their job performance. When they failed to achieve the goals outlined in their respective plans, Harrah's terminated their employment.

## B. Facts Particular to Williams' Claim

Georgia Williams is a resident of Lawrenceville, Georgia. A high school graduate, Williams spent twenty-five years working in retail before entering the casino gaming industry in 1996 as a Slot Floor Person at The Grand. She was promoted to Slot Supervisor in 1997, then to Slot Shift Manager in 1998. Williams remained in the position of Slot Shift Manager for the duration of her employment at the casino. From 1996 until 2003, Williams maintained a satisfactory performance history. During those years, she received favorable Annual

Performance Appraisals and incurred no disciplinary "write-ups." Williams also received annual pay raises of approximately two to four percent.

In October 2003, GCI disciplined Williams for failing to cooperate in an internal investigation of alleged misconduct on the part of certain employees. That incident, along with an issue involving the rotation of shifts, resulted in Williams' poor score on her Annual Performance Appraisal for 2003-2004, which necessitated Williams' placement on an Individual Development Plan for 2004. Williams successfully completed the Plan and received higher scores on her Annual Performance Appraisals over the next two years. On March 25, 2006, the new management of Harrah's conducted its first Performance Appraisal of Williams. The results indicated that as of that time, Williams was largely meeting Harrah's expectations.

In December 2006 as part of its performance review, Harrah's management administered its Supervisory Feedback Survey ("SFS"), which solicited employees' opinions regarding the leadership abilities of their supervisors. Through the SFS, employees gave direct feedback on how well their supervisors "Get Them" (understand them, their goals, strengths and opportunities, and what inspires them), "Guide Them" (show them what success looks like, coach them, express confidence, help them grow), and "Root for Them" (celebrate their success, commit themselves to their development). Harrah's considered any score below 3.5 out of 5 unsatisfactory, and supervisors scoring below that mark were placed on individualized 90-Day Action Plans to target problem areas.

At the time Harrah's administered the 2006 SFS, Williams supervised between twenty and forty employees in her capacity as Slot Shift Manager. She scored 2.7 out of 5 on the SFS, placing her in the bottom third percentile of all supervisors who were evaluated. Williams' score contributed to her poor Annual Performance Appraisal, which in turn led Harrah's to place

Williams on a 90-Day Action Plan at the end of February 2007. The Plan stated clearly that failure to meet all of the expectations outlined therein would result in separation from employment. Harrah's gave Williams a deadline of May 24, 2007 for completion of her Plan goals.

While Williams was on the Plan she met periodically with her supervisor Brad Hirsch to get feedback on her progress. On at least two occasions, Hirsch encouraged Williams to consider stepping down from her position as Slot Shift Manager and into a different position better suited to her capabilities. Williams declined these offers. At the end of her 90-Day Action Plan, Hirsch determined that Williams had not met all of her goals and recommended to Human Resources Manager Tammy Young that Williams' employment be terminated. Young independently reviewed Hirsch's findings and also concluded that Williams had not successfully completed the Plan. Consequently, Harrah's terminated Williams' employment on June 22, 2001.

At the time of her termination, Williams was fifty-six years old and earned an annual salary of $58,500.00. On July 18, 2007, Williams filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") based on race, gender, and age discrimination. In the Charge, Williams alleged that Hirsch subjected her to age-related comments on two occasions, each time asking if she thought a younger person should be doing her job. She received a Right to Sue Letter from the EEOC on August 27, 2008, and filed the instant lawsuit on November 24, 2008. The Court consolidated her case with her Co-Plaintiff's on February 17, 2011.

### C. Facts Particular to Tams' Claims

Josie Tam is a resident of Biloxi, Mississippi and a native of Madagascar. A high school graduate, Tam came to The Grand with over twenty years experience in the gaming industry, having worked at casinos in Madagascar, England, Spain, the Bahamas, Iowa, Illinois, Louisiana, and Mississippi. Tam began working at The Grand as a Pit Manager in 1996 and was promoted to Assistant Shift Manager for Table Games in 2004. From 1996 until 2006, Tam's performance history was largely satisfactory. Throughout those years, she received favorable Annual Performance Appraisals and annual pay raises and incurred only a single disciplinary write-up in 2001.[3]

In 2006, Tam received two disciplinary write-ups. In September of that year, Tam was written up for making an inappropriate inquiry into her daughter's request for time off. Though Tam denied any wrongdoing, her supervisors viewed Tam's conduct as an attempt to circumvent established protocol and exert improper influence over the scheduling office. In December 2006, Tam was written up for failing to stop the play of an "advantage player," which resulted in a loss to the casino. In this instance, Tam admitted that surveillance had alerted her to the player's presence, but again denied any wrongdoing regarding her handling of the situation.

These incidents resulted in Tam's overall rating of "Needs Improvement" on her Annual Performance Appraisal in February 2007, after which Harrah's placed her on a 90-Day Action Plan.[4] The Plan outlined numerous goals that Tam would be required to achieve to retain her employment, most of which focused on improving her leadership, technical, and communication skills. Tam met periodically with supervisor Denise Alford to discuss her progress towards the goals in her Action Plan. Alford repeatedly communicated her concerns that Tam was not

---

[3] The write-up was related to an error Tam made in counting and documenting the number of chips in her rack.

[4] At some point, the Plan was extended by three weeks in order to accommodate a previously planned vacation that Tam was scheduled to take during the period of her Action Plan.

making sufficient progress and recommended that Tam move back into the Pit Manager position. According to Alford, Tam was a hard worker and dedicated employee, but was not yet equipped with the necessary skills to handle the demands of the Assistant Shift Manager position. On May 24, 2007, Tam filed her first Charge of Discrimination with the EEOC, alleging discrimination on the basis of her age, sex, and national origin. The Charge recites Tam's age, sex, and national origin, but otherwise makes no factual allegations in support of her claim that Harrah's discriminated against her on those bases.

On May 28, 2007, near her Action Plan deadline and just days after filing her Charge of Discrimination, Tam was the Assistant Shift Manager on duty when she was summoned to assist with the disbursement of a large jackpot. Tam approved a payout to the winning customer that did not reflect the proper amount of federal tax withholding, resulting in a $7,000 loss to the casino. When her 90-Day Action Plan ended shortly thereafter, her supervisors determined that Tam had not successfully completed the goals outlined therein and recommended her termination.

Harrah's terminated Tam's employment on July 3, 2007. At the time of her termination, Tam was fifty-three years old and earned an annual salary of $70,000.00. Tam was unemployed for two weeks before accepting a position as Assistant Shift Manager at a casino in Gulfport, Mississippi. On July 9, 2007 Tam filed an additional Charge with the EEOC alleging a retaliation claim. She received a Right to Sue Letter on August 27, 2008, and filed the instant lawsuit on November 24, 2008. On February 17, 2011, the Court consolidated Tam's case with her Co-Plaintiff's.

## II. LEGAL STANDARDS

### A. ADEA

To establish a prima facie case of age discrimination under ADEA, a plaintiff must show by a preponderance of the evidence that: 1) she was at least 40 years old at the time of the alleged discrimination; 2) she was subjected to an adverse employment action; 3) she was otherwise qualified for the position; and 4) she was replaced by a younger worker. Tuttle v. Metro. Gov't of Nashville and Davidson Cnty., 474 F.3d 307, 317 (6th Cir. 2007) (citing Rowan v. Lockheed Martin Energy Sys Inc., 360 F.3d 544, 547 (6th Cir. 2004)). If the plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Coomer v. Bethesda Hosp., Inc., 370 F.3d 499, 511 (6th Cir. 2004). If the defendant proffers such a reason, the plaintiff must then satisfy the ultimate burden of persuasion, demonstrating by a preponderance of the evidence that the defendant's proffered reason was merely pretext for discrimination. Id.

**B. Title VII**

Claims brought under Title VII are subject to a similar analysis under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as modified by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). To establish a prima facie case of discrimination on the basis of membership in a protected class,[5] the plaintiff must show that: 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position; and 4) she was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006). Once a prima facie case has been established, the plaintiff is entitled to a presumption that the defendant discriminated against her in violation of Title VII. Id. at 706. The defendant may rebut this presumption by setting forth a legitimate, nondiscriminatory reason for the adverse treatment that would be legally sufficient to justify

[5] The protected classes under Title VII include race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2.

judgment for the defendant.  Id. at 706-07.  If the defendant satisfies this burden, the presumption of discrimination falls away, and the plaintiff then needs to show that the defendant's proffered reason is pretext.  Id. (citing Burdine, 450 U.S. at 255).  Though the burden of production shifts throughout the analysis, the plaintiff always bears the ultimate burden of proving, by a preponderance of the evidence, the defendant's intent to discriminate.  Id. at 707 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

When the claim under Title VII is one of retaliation, a plaintiff must demonstrate that:  1) she engaged in an activity protected by Title VII; 2) the defendant knew of her exercise of a protected right; 3) the defendant subsequently took an adverse employment action against the plaintiff or subjected her to extreme harassment; and 4) there was a causal connection between the plaintiff's exercise of her rights and the adverse employment action.  Barrett v. Whirlpool Corp., 556 F.3d 502, (6th Cir. 2009) (citing Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000); Allen v. Mich. Dep't of Corr., 165 F.3d 405, 413 (6th Cir. 1999)).  After a plaintiff has made this showing, the same burden-shifting set forth above takes place.  The defendant must proffer a legitimate reason for the adverse action that is unrelated to the plaintiff's exercise of a protected right, and the plaintiff must then persuade the court that the defendant's explanation is pretext.

## III.  CONCLUSIONS OF LAW

### A.  Williams' Claim

Turning first to Williams' claim under the ADEA, the first two prongs of her prima facie case clearly have been satisfied.  There is no dispute that Williams was fifty-six years old at the time of the alleged discrimination, and thus within the statutorily protected class.  Also, in terminating her employment, Harrah's unquestionably subjected Williams to an adverse

employment action. Williams failed to prove by a preponderance of the evidence, however, the remaining two prongs of her prima facie case—that she was qualified for the position she held and that she was replaced by a younger worker. As a consequence, Williams' ADEA claim necessarily fails.

To show that she was qualified for the position she held, Williams must prove that she was meeting her employer's legitimate expectations at the time of her termination. Webb v. ServiceMaster BSC LLC, No. 10-6520, 2011 WL 4056326, at *2 (6th Cir. Sept. 14, 2011); Strickland v. Fed. Express Corp., 45 F. App'x 421, 424 (6th Cir. 2002). In support of this element of her claim, Williams testified that she had worked in the casino industry for eleven years and was awarded two promotions during her tenure at The Grand. At the time of her termination, Williams had worked as part of the management team—specifically as a Slot Shift Manager—for approximately nine years. In addition, Williams indicated that she earned annual pay increases, favorable annual performance reviews, and had no disciplinary issues save for a single incident for which she was "written up" in 2003.

Williams' evidence speaks largely to the adequacy of her performance as judged by the standards of her previous employer, GCI. However, it fails to establish that Williams' performance was up to par with Harrah's more demanding expectations. Sixth Circuit precedent holds that prior satisfactory performance reviews suffer from the deficiency of "staleness" and do not establish that a plaintiff was "qualified at the time of her termination." Webb, 2011 WL 4056326 at *2; Strickland, 45 F. App'x at 424. This is because an employee's performance can change over time, as can an employer's expectations. Strickland, 45 F. App'x at 424. Ample evidence was presented that when Harrah's took over operation of The Grand in 2005, performance expectations did in fact change. What was once adequate by GCI's standards was

no longer satisfactory under Harrah's more demanding expectations. At best, Williams' evidence establishes that at some time in the past, her performance lived up to the expectations of her former employer, GCI. The evidence also supports the conclusion that at the time she was terminated, Williams was not living up to Harrah's performance expectations.

For instance, shortly after taking over, Harrah's implemented the SFS, whereby members of management were evaluated not only by their immediate supervisors, but also by their direct reports. This form of review added an extra layer of management accountability and had never been used as part of GCI's performance review process. In addition, several members of Harrah's management testified to the caliber of performance Harrah's expects of its employees. Denise Alford, a former Shift Manager, testified that Harrah's employees were highly sought after in the industry because of the quality of training that Harrah's provided. Darrell Pilant, a Vice President of Casino Operations, testified that Harrah's is widely regarded as among the best in the business, a reputation he attributes to the performance standards to which they hold their employees. In fact, he testified that he receives frequent calls from recruiters seeking to hire people from Harrah's casinos. Tammy Young, the Human Resources Manager at Harrah's Tunica property, also testified that individuals hired from other casinos require additional training to be brought up to the level of performance Harrah's expects of its employees. All of this evidence supports the conclusion that upon Harrah's acquisition of The Grand, heightened performance expectations were put in place.

Additional evidence indicates objectively that Williams failed to meet these heightened expectations. Williams' personnel records reveal that she began having performance-related problems shortly before Harrah's took over and that these problems continued during her employment with Harrah's up to the time she was terminated. Though Williams downplayed the

"single incident" for which she was written up in 2003, it is clear that this incident seriously damaged Williams' credibility with both her supervisors and her direct reports.[6] The records reveal that the resulting loss of trust in Williams led to tension, hostility, and conflict within her department. Following this incident, Williams received poor marks on her Annual Performance Appraisal for the 2003-2004 review period, scoring "Below Expectations" in the areas of "Teamwork," "Support of Corporate Values," "Leadership," and "Occupational Competence." (Stip. Ex. #7.) Thereafter, her supervisors placed Williams on an Individual Development Plan for 2004, setting forth numerous improvements Williams would be required to make to retain her employment. (Stip. Ex. #8.) Williams successfully completed this Individual Development Plan, and her next Performance Appraisal showed signs of improvement. Nevertheless, Williams' personnel records from 2003 onward reveal inadequacies and inconsistencies in her job performance that began well before Harrah's acquired the property.

---

[6] According to personnel records, Williams made false allegations of impropriety against a fellow manager with whom she did not get along. A detailed summary of the incident and the harm it did to the working environment can be found in Williams' Individual Development Plan for 2004 (Stip. Ex. 8). It provides, in part:

> You made allegations that associates came to you with information of impropriety levied against [two co-workers], but refused to disclose the names of the associates involved until you were forced too [sic] under peril of being terminated for insubordination. The names that you provided denied and [sic] involvement or contacting you in the resulting investigation. Time and man hours were wasted and the investigation revealed that you attempted to advance your own personal agenda by discrediting a shift manager and supervisor. You committed the following infractions in the process:
> 1) impeded an official inquiry by being unresponsive to relevant questions;
> 2) impeded an official inquiry by providing inaccurate or incomplete information;
> 3) being insubordinate by refusing to give information demanded by a supervisor;
> 4) creating a hostile work environment by purposefully making untruthful or incomplete allegations against peers;
> 5) creating a hostile work environment by falsely naming direct reports as witnesses to events that never occurred;
> 6) violated open door policy;
> 7) being negligent by precipitating a situation that impeded operations, created an undo [sic] administrative burden and unnecessarily alarmed peers and direct reports.

(Id.)

Williams' record of performance under Harrah's new management began with her 2005-2006 Performance Appraisal. The Appraisal indicated that Williams had "made an exceptional start at addressing a new way of doing business," but also that she would be "expected to hold supervisory and hourly staff to a higher level of customer service." (Ex. #16.) This would require Williams' "total compliance to the standards of the Harrah's Corporation and her constant surveillance of her assigned staff." (Id.) Later records demonstrate that Williams never achieved the level of performance Harrah's demanded.

The results of Williams' 2006 SFS, for example, can only be described as dismal—she scored in the bottom third percentile of all supervisors who were evaluated. (Stip. Ex. #9.) The comments provided by Williams' direct reports indicated that communication, feedback, consistency, and follow-through were some of Williams' problem areas. The comments were also indicative of continuing tension and hostility between Williams and her associates. These results contributed to Williams' poor Performance Appraisal for the 2006 review period, on which Williams received low marks in areas of "Employee Capability" and "Teamwork & Values." Ultimately, these concerns led to the development of a 90-Day Action Plan designed to improve Williams' performance in these areas. Her supervisors clearly communicated to Williams that she would be "required to show immediate and continued improvement in order . . . to retain her employment." (See Stip. Ex. #10.) The areas for improvement identified in the Action Plan were: 1) credibility with direct reports; 2) creating an atmosphere of consistency and fairness; 3) improvement of written and verbal communication skills; and 4) teaching, coaching, and mentoring her team. (Id.)

Pursuant to the Action Plan, Brad Hirsch monitored Williams' progress and met with her periodically to address his continued concerns about her performance.[7] On May 29, 2007, Harrah's informed Williams that she had failed to meet numerous Action Plan expectations and that management lacked confidence in her ability to perform successfully in the Slot Shift Manager position. They offered to move Williams to an Assistant Shift Manager position at a smaller sister property where she could work on improving her leadership skills in a lower-pressure environment. When Williams declined this opportunity, Harrah's opted to terminate her employment.

Collectively, the evidence shows that Williams began having performance problems in 2003 under GCI's performance standards. In 2005, Harrah's took over and established higher performance expectations than those previously in effect. Williams continued to struggle to meet management's expectations. Her Annual Performance Appraisals demonstrated a lack of consistency in her performance from 2003 forward. Her Performance Appraisal for the period immediately preceding her termination documented Williams' performance problems at that time. Williams' failure to adequately improve, by Harrah's standards, performance in the areas identified in her Action Plan is also well-documented. This evidence belies Williams' contention that she was qualified for her position at the time she was terminated.

In addition, Williams failed to prove that she was replaced by a younger individual. Williams testified that she was replaced by an individual whom she identified only as "Chad." Williams offered no testimony or documentary evidence establishing the basis of her belief that "Chad" was her replacement. Harrah's response to the EEOC charge, dated nearly a year after Williams' termination, did indicate that an individual named "Chad Cochrane" was a current

---

[7] Hirsh documented Williams' progress on the plan and kept records of his communications with her regarding his continued concerns about her performance. (Ex. #14, p. 107.)

member of the Slot Manager staff. (Ex. #14, p. 59.) However, there is nothing in the record showing how long this person had been on staff or when he was hired. Thus, there is no evidence upon which the Court can conclude that this person was Williams' replacement, save for the unsubstantiated statement of Williams herself. Moreover, Tammy Young testified that Williams' replacement was a man named Matt Haskill, who was hired out of a graduate program at an Ivy League school. Certainly a person in Young's role as Human Resources Manager would be in a better position than Williams to know the identity of Williams' replacement. Importantly, no evidence was offered regarding Haskill's age.

As Plaintiff, Williams' bears the burden of proving by a preponderance of the evidence each element of her claim. Her failure to prove that she was both qualified for her job at the time of her termination and that she was replaced by a younger individual defeats two essential components of her prima facie case. Therefore, the Court finds in favor of Harrah's on Williams' ADEA claim.[8]

## B. Tams' Claims

### 1. ADEA

As in her Co-Plaintiff's claim, the first two prongs of Tam's prima facie case are not in dispute: Tam was fifty-three years old at the time of the alleged discrimination, placing her

---

[8] Even had Williams proven all elements of her prima facie case, the great weight of evidence supports the conclusion that Harrah's terminated Williams' employment for legitimate, performance-related reasons. The entire basis for Williams' age discrimination claim rests on her testimony that Brad Hirsch asked her on two occasions whether she thought a younger employee should be doing her job. Hirsch denies ever making any age-related comments to Williams. Even accepting Williams' testimony as true, these two isolated remarks are far outweighed by the abundance of evidence documenting Williams' performance problems. Moreover, they were made not by Tammy Young, the person ultimately responsible for the decision to terminate Williams' employment, but by Hirsch, who merely recommended Williams' termination. Young testified that Hirsch recommended Williams' termination because she failed to accomplish the goals set forth in her Action Plan. Young independently reviewed Hirsch's findings regarding Williams' performance on the Action Plan and concluded that she had not been successful. Only then did Young decide to terminate Williams' employment. This evidence simply would not support a finding—were this Court in a position to make one—that Williams' age was the but-for cause of her termination. Supreme Court and circuit precedent make clear that such a showing is required to prevail under the ADEA. See Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343, 2351 (2009); Geiger v. Tower Automotive, 579 F.3d 614, 620 (6th Cir. 2009).

within the protected class, and she was terminated, which is an adverse employment action. Tam failed to prove by a preponderance of the evidence, however, that she was qualified for the position she held and that she was replaced by a younger worker. Moreover, Tam presented no evidence by way of testimony or otherwise indicating any age-based animus towards her from any Harrah's employee. Even in the Charge of Discrimination she filed with the EEOC, Tam made no allegations—save only for the facts of her age and her termination alone—that would support an *inference* of age discrimination, let alone a finding that Tam's age was the but-for cause of her termination. These deficiencies are fatal to Tam's ADEA claim.

To show that she was qualified for the position she held, Tam must prove that she was meeting her employer's legitimate expectations at the time of her termination. Webb v. ServiceMaster BSC LLC, No. 10-6520, 2011 WL 4056326, at *2 (6th Cir. Sept. 14, 2011); Strickland v. Fed. Express Corp., 45 F. App'x 421, 424 (6th Cir. 2002). In support of this element of her claim, Tam testified that she had thirty-three years experience in the casino industry, including eleven years experience at the Tunica property. She began at The Grand in 1996 as a Pit Manager and was promoted to Assistant Shift Manager in 2004. Throughout her tenure at The Grand, Tam testified that she received favorable annual performance evaluations and regular pay increases.

This evidence is sufficient to establish that Tam was largely meeting her employer's expectations for the duration of her employment with GCI.[9] However, as mentioned above, Sixth Circuit precedent clearly holds that prior satisfactory performance reviews suffer from "staleness" and do not establish that a plaintiff was "qualified at the time of her termination." Webb, 2011 WL 4056326 at *2; Strickland, 45 F. App'x at 424. This is because an employee's

---

[9] Tam testified that she was subject to a single disciplinary write-up in 2001 for miscounting the chips in her rack, but it appears this was an isolated occurrence.

performance can change over time, as can an employer's expectations.  <u>Strickland</u>, 45 F. App'x at 424.  Ample evidence was presented that when Harrah's took over operation of The Grand in 2005, performance expectations did in fact change.  Harrah's implemented employee performance expectations far more demanding than those of GCI.[10]

It is equally clear based on her personnel records that Tam failed to measure up to Harrah's heightened expectations.  In the eight months leading up to her termination, Tam's personnel records document numerous concerns related to her job performance.  On September 20, 2006, Tam was written up for "using her position to influence a PTO [paid time off] decision regarding her daughter (Cindy Powell)."  (Stip. Ex. #1.)  While Tam maintains that she was merely inquiring as to whether her daughter's request for time off had been granted, her actions were perceived by management as compromising the fairness and consistency of the system and as an improper use of her authority.  In January 2007, Tam was written up again, this time for failing to report and follow up on an "advantage player" (commonly known as a "card counter") to which surveillance had alerted her.  According to Harrah's, Tam jeopardized company assets by failing to stop his play and/or neglecting to alert others on the management team of the advantage player's presence.  In February 2007, Tam received her Performance Appraisal for the 2006 evaluation period, on which she earned an overall rating of "Needs Improvement."  (Stip. Ex. #3.)  She received low marks in a number of areas under "Employee Capability" and "Teamwork & Values."  In particular, Harrah's identified consistency, meeting deadlines and becoming "action oriented," communication, and adaptability as areas in which Tam needed to improve.  (<u>Id</u>.)  Regarding Tam's communication skills, the Performance Appraisal indicated that Tam should "display a calm, in-control demeanor and speak at a slower pace so she may be

_____

[10] It is unnecessary to repeat the Court's prior discussion of Harrah's heightened performance expectations and the evidence thereof.  Instead, the Court incorporates by reference its previous discussion of these standards, which is set forth fully in its analysis of Williams' ADEA claim.

more easily understood." (Id.) In addition, Tam needed "to present information in a less dictatorial fashion" and "use more professionalism when addressing differences with fellow employees." (Id.) Finally, the Appraisal noted concern that Tam's recent performance write-ups reflected a lack of good judgment. (Id.)

As a result of the poor ratings on her Performance Appraisal, Harrah's placed Tam on a 90-Day Action Plan. The purpose of the Plan was "to set specific expectations for Tam with regard to the performance of her job duties." (Stip. Ex. #4.) The Plan clearly articulated Harrah's expectations of Tam and stated expressly that her failure to meet those expectations would result in "disciplinary action up to and including separation of employment." (Id.) Tam met frequently with her supervisors to get feedback on her progress toward the Plan's objectives. Denise Alford, one of the supervisors who met with Tam regularly, testified that she communicated to Tam her concerns that Tam was not making satisfactory progress on the Plan's goals. In fact, Alford testified that on a number of occasions she encouraged Tam to accept a different position that she believed was better suited to Tam's capabilities. Tam declined these offers.

Shortly before the end of her 90-Day Action Plan, another incident bearing on Tam's job performance occurred. On May 28, 2007, Tam was the Assistant Manager on duty when a customer hit a large jackpot. Tam approved a payout to the winning customer which failed to withhold the proper amount in federal taxes. This error resulted in a $7,000 loss to the casino. Alford testified that a mistake of this magnitude would ordinarily result in immediate termination. Instead, Tam's supervisors once again encouraged her to consider stepping down into a Pit Manager position where she could work on improving her leadership skills in preparation for a possible future promotion. Tam once again declined. At the end of her 90-Day

Action Plan, her supervisors concluded that Tam had not successfully completed the Plan goals and recommended her termination. After reviewing the relevant information, Human Resources Manager Tammy Young agreed and terminated Tam's employment.

The events outlined above, the occurrence of which are largely undisputed, leave the Court unconvinced that Tam was meeting her employer's expectations at the time she was terminated. In fact, the preponderance of evidence supports a conclusion to the contrary. Therefore, the Court finds that Tam has failed to carry her burden of proving that she was qualified for the position she held at the time Harrah's terminated her employment.

Likewise, Tam failed to prove that she was replaced by a younger individual. Tam testified that her replacement was a man named Chris Griffin. Tam admitted she did not know the age of her alleged replacement, but "assume[d] he [was] in his mid-thirties." Alford, on the other hand, testified that Tam was not replaced at all. Rather, Tam's position remained vacant until the fall of the same year, when Harrah's restructured the department and reassigned existing employees. In the meantime, Alford testified, other staff-members covered the duties Tam was once responsible for. Even if the Court found Tam and Alford equally credible,[11] and thus afforded equal weight to each of their testimony, this would be insufficient to satisfy Tam's burden of proving that she was replaced by a younger individual. Therefore, the Court find in favor of Harrah's on Tam's ADEA claim.

2. Title VII

a. National Origin

---

[11] The Court apportions credibility in this manner for the sole purpose of affording Tam the benefit of every possible doubt. In fact, Tam's credibility as a witness was called into question by her candid admission that she had difficulty understanding the questions that were asked of her on the stand. In addition, Tam gave no foundation for the basis of her belief that she was replaced by a man named Chris Griffin. Alford, on the other hand, testified on the basis of her own personal knowledge that Tam was not replaced and that the remaining staff in the department took on Tam's job duties after her termination.

Tam's Title VII claim of discrimination on the basis of her national origin is analyzed under the same framework as her ADEA claim.  In fact, the components of the prima facie case are identical, and therefore her claim fails under Title VII for identical reasons.  Specifically, Tam has failed to prove two of the four components of her claim.  A native of Madagascar, Tam's membership in a protected group is not in dispute, nor is the fact that she suffered an adverse employment action.  But Tam has failed to prove the remaining elements of her claim: that she was qualified for the position she held and that she was replaced by someone outside the protected class.  As set forth fully in the Court's analysis of her ADEA claim, Tam's evidence failed to establish that she was meeting Harrah's legitimate performance expectations at the time of her termination.  Tam likewise failed to carry her burden of proof in establishing that she was replaced by a person outside the protected class.  Therefore, the Court finds in favor of Harrah's on Tam's claim of discrimination on the basis of national origin.

b.  Retaliation

Finally, the Court turns to Tam's claim that her termination was retaliation for engaging in a protected activity.  When she filed her initial charge of discrimination on May 24, 2007, Tam undoubtedly engaged in activity protected by Title VII.  Also, Harrah's was aware of Tam's activity, as evidenced by the Notice of Charge, dated May 31, 2007 (Ex. #22), and the testimony of Tammy Young, who acknowledged receiving the Notice in the Human Resources office.  Further, Tam's termination satisfies the requirement of an adverse employment action.  Thus, the success of Tam's retaliation claim turns on whether she has proven a causal connection between her filing of the EEOC charge and her termination.

To establish the requisite causal connection, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had

the plaintiff not filed a discrimination action." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000) (internal citations omitted). Though no singular factor is dispositive in the causal connection analysis, evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's protected conduct is relevant to the issue of causation. Id. (citing Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987)). Sixth Circuit precedent also is clear that temporal proximity alone is insufficient to establish a causal link. Nguyen, 229 F.3d at 566; Parnell v. West, No. 95-2131, 1997 WL 271751, *2 (6th Cir. May 21, 1997) (holding that temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence); Cooper v. City of North Olmsted, 795 F.2d 1265, 1262 (6th Cir. 1986) (rejecting proposition that temporal proximity is enough in itself to establish a causal connection and noting plaintiff's failure to produce any additional evidence that would support such a link). However, when temporal proximity is considered along with other evidence of retaliatory conduct, such evidence may be sufficient to establish causation. Nguyen, 229 F.3d at 566; see also Moore v. KUKA Welding Systems, 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that close proximity in time between adverse action and protected activity *coupled with* the evidence of frequent discipline for trivial matters and unwarranted criticism of the plaintiff's work supported a finding of retaliation).

In support of this element of her claim, Tam notes that Harrah's terminated her employment "a little over thirty (30) days after her charge of age, sex and national origin discrimination with the EEOC." (Pl.'s Proposed Findings of Fact at p. 27.) Tam offers no other evidence in support of the causal connection other than a blanket assertion that "[w]hen the totality of the circumstances are examined in this matter, Ms. Tam has met the final element of

her *prima facie* case." (Id.) While this Court considers all relevant factors in evaluating causation, the only evidence Tam has offered that speaks to causation is temporal proximity. As the cases cited above make clear, this evidence alone is insufficient to establish the requisite causal link.

Moreover, the significance of temporal proximity is undercut when an employee's performance problems precede the employee's protected conduct. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); Mason v. Sash & Door Co., 26 F. App'x 531, 535 (6th Cir. 2002) ("[Plaintiff] failed to establish a causal connection between protected activity and the adverse employment action because the evidence showed [Plaintiff] knew his position was in jeopardy several months before [he] wrote his March 5 letter accusing [Defendant] of age discrimination."). Tam's record of performance problems in the months leading up to her termination is well-documented. Concerns related to Tam's judgment and decision-making, communication skills, consistency, and management capabilities are reflected in several disciplinary write-ups beginning in September 2006, her Annual Performance Appraisal for 2006, and the feedback Tam received on her progress towards the goals in her Action Plan. This history of performance problems precedes by at least eight months Tam's charge with the EEOC, a timeline which discounts the significance of the temporal proximity between Tam's termination and her charge of discrimination.

Having found that the only evidence of a causal link to support Tam's retaliation claim is temporal proximity, and having further found that this evidence is insufficient as a matter of law to carry her burden of proof, the Court finds for Harrah's on Tam's retaliation claim.

**IV.  CONCLUSION**

Having found that Plaintiffs did not carry their burdens of proof for the reasons set forth above, the Court hereby finds in favor of Defendants Harrah's Entertainment, Inc. and Harrah's Operating Company on all claims as to both Williams and Tam, and enters judgment accordingly.

**IT IS SO ORDERED** this 31st day of October, 2011.

<u>**s/ Bernice Bouie Donald**</u>
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT COURT JUDGE**